Opinion op the Coukt.
THIS is the same case brought before this court by the now defendants in error, and decided against them,, ag reported in 2 Marsh. 528, to which, for more particular details of the circumstances, reference is made.
The court below decreed that Ford and Warren should pay the price of the yarns actually received by them from the ware-house. As will be seen by the former report, the circuit judge, on presenting to him the bill, before it was filed, granted an order dated the 12th of December 1814, and process issued in pursuance thereof the same day, “ requiring Berthoud and Son, the owners of the ware-house, to give bond and security,.iu the penalty of §20,000, conditioned to have the yarns in the bill mentioned, forthcoming and ready" to be delivered to Ford and Warren, as the court should direct, together with the payment of such damages as the said Ford and Warren should sustain by reason of the detention of the yarns from them; or to pay the value of the yarns in contest, and such damages, in addition thereto, as they should be entitled to; or, in case Berthoud and Son should fail or refuse to give such bond, the sheriff was directed to take said yarns, and keep them safely, and deliver them to the'said Ford and Warren, upon their giving bond in the same penalty,with security, (named in the order,) to Berthoud and §on, and Duncan and M’Call, conditioned for the re-delivery of the yarns, or the payment of the value thereof, and in addition thereto, such damages as the obligors, or either of them, should sustain by reason of the delivery, of the yarns to Ford and Warren.”
Upon the eveduiicm of process, in pursuance of this order, Berthoud and Son refused to give the bond and security required, and the sheriff took, possession of the yarns, and Berthoud and Son gave a receipt, stating how the yarns were first held by them; declaring they were stored in their ware-house for the sheriff, and subject to his order. Ford and Warren then gave their bond, with the security directed by the order, and the *27 sheriff delivered ever the yarns'-to Ford'rind Warren., This-wasTlbne on the day the process bears date, and all wa¿$!lmsacted without reipoying the yarns from the ware-house. Ford and Warren, expressing some fears that the yarns might be injured by the fldbds, from the low situation o'f the-ware-house of Berthoud and Son, procured-another, which stood beyond the rising of the wat§¿ipnd attempted to take the yarns out of the ware-hojpprof Berthoud and Son, to store them in the one so obtained; but Berthoud and Son positively refused to deliver them up. Ford and Warren then advertised the yarns for .sale on the 30th of January 1815, before the door of the ware-h'ouse, after having given Sproule, Armstrong & Co. and Duncan and M’Call notice, that they were ready to comply with their bonds to Coleman, held by Duncan and M’Call, on the money being paid, or secured to them.
On the 23d of January 5815, before the day of sale, Sproule, Armstrong & Co. presented their petition to the same judge, remonstrating against his former order- and the proceedings under it, contesting the tille of Ford and Warren to the yarns, and praying a suspension or modification of the first order. The judge then made an order, reciting that Ford and Warren “ werc-about to make an improper and unauthorised use of the first order, and had advertised the yarns for sale; and-that the petition having represented: that there was a doubt as to the validity of the bond executed by Ford, and Warren, in pursuance of the first order, not only as to the sufficiency of the sureties, but also as to the obligatory force of it on one ,of the securities * and that,, being satisfied that no material inconvenience could, arise to either of the parties litigant, by staying the yams in the ware-house and possession ofBcrthop'u and; Sori-fsubject to tbe future order of the court, which-would sit on the first of the next month, the said Ford: and Warren were, therefore, directed to make no" sale, disposition ,or transfer of the yarns, oi; any part thereof,, and that they should not attempt to act under the first order, by taking the yarns in contest into their possession, until the further order of the court. And James Berthoud and Son ware directed to retain the yarns in their possession, until- the further order of the court; and, the sheriff w§.s likewise directed not to remove or¿ *28 otherwise interfere with the yarns, or dispose of them,- or anf Part thereof.”
A copy oí, this order was forthwith executed, and obeyed by all concerned. At the court which sat the succeeding month, as referred to in the last recited.or-; der, answers were filed, and orders of postponement and continuance were made, until the next term; but no order was obtained by either party, varying the former orders of the judge.
At the next term, which came in April 1815, and on the twenty-second day of the month, upon motion and argument, the court annulled and reversed the last order of the judge before recited, and ordered that Ford and Warren should have possession of the yarns, and that the sheriff and Berthoud and Son should forthwith .deliver- them over, and Ford and Warren were author-ised and permitted to make sale of the yarns, if they chose to do so. This order was, however, subject to the condition, that Ford and Warren should enter into and execute, in their proper persons, a bond, in the clerk’s office, with security then approved, in addition to their bond already given, conditioned to secure Sproule. Armstrong & Co. and all concerned, and to deliver up the yarns when required by the court, or pay the true value thereof to such of the parties a? should be entitled, and also all damages which the real owner should be entitled to, by the delivery thereof,” This bond was accordingly given, and Ford and Warren took possession of, and shipped the yarns. But before this order, and about the first of April 1815, the flood rose into the ware-house, and wet and injured most of the yarns, and destroyed some part, so that Ford and Warren received only 35,064 pounds in good order, and 36,396 pounds of damaged yarns, making in the whole 72,260 pounds, instead of 119,56-2 pounds, the whole quantity first delivered by Ford and Warren. The whole of the residue, except what was retained by the ware-house keepers for storage, was destroyed by the flood, or not accounted for, and delivered to Ford and Warren, This quantity of 72,260. pounds, at eight cents per pound, was what composed the decree of the chancellor, on the cross bill filed by Sproule, Armstrong & Co. as policed in the former opinion of this, court.
in actions of trover and of ^spass .for asionortho" taking of pr°Per&)tIle the propertyf afterwardsby *he wro"?-“ot prevent the owner from recovering the full value of the property, at the time of the conversion or taking.
*29 The design of this writ of error, issued by the defendants in the former writ, is, to charge Ford and Warren with the 47,302 pounds which they did not actually receive; and it is contended, that as their proceedings were «illegal, and have been so decided, they ought to be charged with the whole amount in the ware-house when their order, as 'first obtained from the judge, operated upon the subject at its first emanation-
It has already been considered and settled by this court, that the application to the chancellor was improper, and that the complainants below had no remedy there. This renders it unnecessary for us to enter into the discussion of the particular merits or demerits of the order of the judge first issued, in response to the argument at the bar, that this order was unprecedented and beyond the powers of the chancellor; for if the whole application to the chancellor was illegal, the consequences of a proper or improper order, would, we apprehend, be the same. Suffice it, however, to remark, that if it be conceded that the first order was an extraordinary stretch of judicial power, the second, procured on the application of the now plaintiffs in error, was no less anomalous and extraordinary.
As the right of the plaintiffs in error is stated, in the former opinion, to be purely legal, and equity only redressed the wrongs resulting (rom an improper application to a court of equity, the^case has been assimilated,, in argument, to an action of trover or trespass, where the criterion of damages is fixed at the time of conversion in the fornier, and the tortious taking in the latter, •■and no subsequent loss or injury to the thing converted or taken, after the conversion or taking, in the hands of the defendant, arising from the act of God, or of third persons, will excuse the defendant from paying the valuer or in any degree mitigate His case. '
1." This position, with regard to these actions, is ad-miíted tobe correct as a general principle; and this case must .come within its influence, unless there is something in its circumstances wffiich will make it correct exception; and, no doubt, there are cases in which damages in thesa actions might he mitigated, by events transpiring by the act of God, or the conduct of the opposite party.
It is evident, that this cannot be assimilated to those actions at law, in which the quo animo is an essential *30 gradient, and may enhance the recovery to the highest criterion; or to a tortious and aggravated taking, where, vindictive damages ought to be given. No malice, or design to injure, could have prompted the defendants in error. Their suit was at all events colourable, and prompted by the powerful motive of regaining a large amount of property, sold to an insolvent individual, who must, from his present circumstances, have been in some degree conscious that he could never pay for it. To take measures to retrieve a loss so great, was natural and proper; and if they mistook the remedy, it is not unusual, and they ought not to be subject to a penal punishment. N othing, then,, but the value of the property, can form the estimate which they ought to pay.
We do not conceive that the bare keeping of the property in the ware-house, and thereby preventing the plaintiffs in error from removing it, ought to subject the defendants to its entire value; because, in the mean time, the plaintiffs might have removed it to a foreign market or sold it here. Whether they would or would not have removed it, or disposed of it, had there been no restraining order, is entirely problematical, and can now never be known. Liability or value ought not to depend upon what might have been done, but on wbat was done. It is, indeed, very probable, that no such removal was contemplated. Coleman did not sell, but pledged the yarns to Sproule, Armstrong & Co. They could noLsell them for one year, unless at tlie price of fifteen cents per pound. . Within that period, Coleman could redeem them. They were permitted, by the contract, to transfer them to Duncan and JirCall, who held them for one year under the same restrictions, with this additional one, that they were not to be transmitted to New-Orleans, during the then existing war, without the consent of Dunean and M’Call. These stipulations go far to show that no removal of the yarns was contemplated, unless an opportunity presented itself, of selling them for fifteen cents, which did not present itself, by any proof in the record. . From this circumstance, then, the damages ought not to be enhanced, or the liability of Ford and Warren increas-. ed.
2. If Ford and Warren had been successful in getting the yarns into their possession or management, at the- *31 time when they first obtained the original order from the judge, they, no doubt," would'have been responsible for the whole amount, at its then value. It is clear, however, that in this they did not succeed in reality, it is true, the sheriff returned that he took possession of them, in the ware-house, and they were there stored in ■his name. He tendered the same possession which he had, to Ford and Warren; and so soon as they made arrangements to move the yarns, the ware-house owners, who previously had been, pro hac vice, agents of the plaintiffs in error, still assumed and exercised that character, and wholly refused to permit their removal. Thus they nominally submitted to the order made, permitted the entries in the books to be changed, and thé yarns to be transferred from one name to another; but whenever the yarns were to be taken away, there was no obedience, and the possession was refused; so that, in truth’and in re'ality, the possession was only changed in name, and in fact remained with the plaintiffs in error. It was, then, only an attempt, on the part of Ford and Warren, to take and use them; and had they succeeded, this would have subjected them to the entire value. But in this attempt they were defeated by the plaintiffs in error, or their ageiits, until the order of court was made, in consequence of which the yarns were taken from the ware-house. For the attempt only, they ought not to be made responsible for the whole value of the articles, unless the effect of the attempt was the loss or destruction of th§ property.
A man by endeavoring to get actual possession of property belonging to another, even by obtaining an illegal order of court authorizing him to take possession of it, does not subject himself to damages arising from the property having been injured while such order was in force, if in fact he never did get possession, and the injury was sustained in the place where the owner had deposited it.-
In applying, then, the common law general principles, which fix the criterion q{ damages by the value of the article, to this case, they are not violated; for it is believed, that in no case has an unsuccessful attempt to take and use property, been punished with the value of that property, unless the effect of that attempt had been the destruction, loss or injury of the property, by keeping it'■-in a place, without the assent of the owner, where destruction came upon. it. Such a case is a sound exception to the general rule, and is applicable tó the present controversy. Here, the attempt was unsuccessful ; the property was left in the place where the plaintiffs in error had chosen it to remain before that time; their subsequent struggles were to keep it there, which they did do, until the destruction came by the flood; and there is ho proof ■ is the <?.ause, that they m- *32 tended to have removed it elsewhere, and the probdbility is, from the various stipulations between each other, that they did not intend to change its position, unless a high and unexpected price was offered. We cannot, therefore, say, that the court erred m refusing to charge them with a greater sum than that of the value: of the yarns which they actually received. Their acts done before they actually got the yarns, all proved abortive, through the conduct of their opponents; and before they did succeed, the flood, over which they had no control, occasioned the loss, in the very place where their adversaries chose the articles to remain. If this were a trial at law, we could not subject them to greater damages, than the court below has done; therefore, we ought not to do so in a court of equity.
The decree must he affirmed with costs»